Donald S. Zakarin
dzakarin@pryorcashman.com
Frank P. Scibilia
fscibilia@pryorcashman.com
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Telephone    212-421-4100
Facsimile    212-326-0806

11 CIV 4822



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MERLIN BV,<br><br>       Plaintiff,<br><br>   v.<br><br>LIME WIRE LLC, LIME GROUP LLC, and MARK GORTON,<br><br>       Defendants. | 11 Civ.<br><br>**COMPLAINT**<br><br><br>(Jury Trial Demanded) |

Plaintiff, by its attorneys, Pryor Cashman LLP, as and for its Complaint against the defendants Lime Wire LLC, Lime Group LLC, and Mark Gorton ("Defendants" or the "Lime Entities"), alleges as follows:

### NATURE OF THE ACTION

1. This is a diversity action for breach of contract. Plaintiff seek damages or, in the alternative, declaratory relief.

2. Plaintiff Merlin BV ("Merlin") is a Netherlands limited liability company that operates on a not-for-profit basis, and that, via rights representation agreements, represents over 12,000 independent record companies in licensing and enhancing the commercial exploitation of

1104108

their copyrights, and in protecting and enforcing those copyrights. The independent record companies represented by Merlin produce, manufacture, sell, license, and in some cases distribute and/or facilitate the distribution and sale of commercial music recordings. Labels such as Epitaph, Rough Trade, Merge, and Beggars Group, among others, are all members of Merlin. Artists on independent record labels represented by Merlin include Vampire Weekend, Arcade Fire, Dizzee Rascal, Neko Case, Spoon, Grizzly Bear, Bright Eyes, Carla Bruni, The National, Tom Waits, DJ Khaled, Dorrough, Tiësto, and Scooter.

3. The Lime Entities are adjudicated Internet music pirates. On May 25, 2010, in an action filed by those record labels owned or controlled by the four "major" record companies -- Universal Music Group, Sony Music, Warner Music Group, and EMI Music (those companies, the "Major Labels," and such action, the "Arista Action") – this Court ruled that the Lime Entities are liable for inducing the infringement of a massive number of copyrighted sound recordings on and via their Lime Wire peer-to-peer ("P2P") software program and file-sharing network. See Arista Records LLC v. Lime Group LLC, et al., 715 F. Supp. 2d 481 (S.D.N.Y. 2010) (the "Arista Decision").

4. Prior to the Arista Decision, the Lime Entities had also infringed the copyrighted sound recordings of Merlin's independent record label members. In exchange for an agreement from Merlin and its members not to file their own lawsuit against the Lime Entities, the Lime Entities agreed in writing that in the event they were to formally conclude a settlement agreement with the Major Labels settling the Arista Action, Lime Wire would offer to Merlin and its label members a settlement agreement on the same "Material Terms" as the settlement agreement with the Major Labels. The Material Terms included the "[t]iming and amount of any cash payments and/or any other consideration given for settlement and/or release of claims."

2

Such settlement offer would be subject to a market share adjustment to take into account the market shares of the settling Merlin members relative to the market shares of the settling Major Labels. And such offer, if accepted by Merlin, would be binding on the Lime Entities. In reliance on this agreement, Merlin and its members forbore from filing their own lawsuit.

5. In or around May 2011, Merlin learned from various media reports that the Lime Entities had formally concluded a settlement agreement with the Major Labels in which they agreed to pay $105 million to the labels. Despite having concluded such a settlement, the Lime Entities did not offer to Merlin and its label members a settlement on the same Material Terms (adjusted to account for relative market share) as the settlement with the Major Labels. In fact, the Lime Entities did not make an offer to Merlin at all. And, when confronted with their obligation to make such an Offer, the Lime Entities simply refused, positing untenable arguments that find no support in the parties' agreement. As a result, Merlin filed this action. In accordance with the terms of the parties' agreement, Merlin and its label members are now entitled to a binding settlement offer from the Lime Entities that includes a cash payment of no less than the amount of the cash payment made to the Major Labels (less reasonable, documented, out-of-pocket legal fees actually paid by the Major Labels to outside counsel in connection with the Arista Action), subject to a market share adjustment to take into account the market shares of the settling Merlin members relative to the market shares of the settling Major Labels.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 in that this dispute is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Personal jurisdiction over the Defendants is proper pursuant to N.Y. CPLR §§301 or 302(a).

7.  Venue is proper in this District pursuant to 28 U.S.C. §1391(a).

8.  This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

## THE PARTIES

9.  Plaintiff Merlin is a Netherlands limited liability company that operates on a not-for-profit basis and that represents a myriad of small and larger independent record companies in protecting and enforcing their copyrights, and that offers a product previously unavailable in the market: a single, non-exclusive license for the use of the copyrights of those record labels. With diverse members in over twenty-five countries, Merlin is the first rights body focusing purely on the interests of independent record companies. With a representative board elected by its members, Merlin exists so that independent record companies have a vehicle that enables them to compete by removing barriers to market entry and to access new revenue streams in the ever-changing world of digital music, including by providing lawful digital music services with the viable product of a single licensing solution whereby they may obtain rights from many labels that otherwise would be too small for practical negotiations due to the transaction costs.

10. Defendants the Lime Entities designed, built, promoted, distributed, sold, maintained and supported software and related services under the "Lime Wire" name and variations thereof.

11. Defendant Lime Group is a Delaware limited liability corporation with its principal place of business in New York, New York.

12. Defendant Lime Wire LLC is a Delaware limited liability corporation with its principal place of business in New York, New York, and is a wholly-owned subsidiary of defendant Lime Group, with which it shares offices and officers/employees. Lime Wire LLC

and Lime Group jointly and severally, and directly and indirectly, designed Lime Wire and update, improve, promote, distribute and market Lime Wire.

13. At all times relevant to this action, Defendant Lime Group had exclusive and complete domination and control over Defendant Lime Wire LLC, such that Lime Wire LLC was its alter ego and mere instrumentality. There was a substantial connection between Lime Group and Lime Wire LLC with respect to the actions complained of herein.

14. At all times relevant to this action, Defendant Mark Gorton was a principal and the Chief Executive Officer of defendant Lime Wire LLC as well as its sole director. He was also a member and the Chief Executive Officer of Defendant Lime Group. Gorton owned 100% of Lime Group. Mr. Gorton was at all relevant times the dominant influence in Lime Group and in Lime Wire LLC.

15. Each of the Defendants is and/or at all relevant times was a party to the unlawful actions complained of, and acted in concert or combination with each of the other Defendants and/or has acted as an agent for each of the other Defendants with respect to the actions and matters described in this Complaint.

16. In the Arista Decision, the Court determined that Gorton "ran" Lime Wire; he was the company's "ultimate decision maker" and his approval was required for "any major strategic and design decisions."

17. The Court further determined in the Arista Decision that Lime Group was intimately involved in Lime Wire's operations. Gorton was Chief Executive Officer of both Lime Wire LLC and Lime Group. And while Lime Wire LLC and Lime Group formally are separate entities, the Court found that Gorton operated them as a "single company." Lime Group and Lime Wire LLC shared offices, computer services and support staff. Employees moved

between the two companies without changing titles or job responsibilities. Lime Group provided numerous services to Lime Wire LLC, including managing its financial operations and employee benefits, hiring Lime Wire employees, and performing investor relations, public relations and customer support functions for Lime Wire.

## FACTS

18. Given the massive copyright infringement occurring on and via Defendants' Lime Wire P2P software program and file-sharing network, on or about September 4, 2008 -- nearly two years prior to the Arista Decision -- Merlin, on behalf of the independent record labels that it represents, through its attorneys, sent a cease and desist letter to the Lime Entities. A copy of the September 4, 2008 cease and desist letter (the "Cease and Desist Letter") is annexed hereto as Exhibit A.

19. While the Lime Entities were continuing on a daily basis to infringe the copyrights of Merlin's independent label members -- even after receiving the Cease and Desist letter -- they were outwardly expressing an interest in offering a legitimate, licensed music service, and in settling the copyright infringement claims of Merlin's members, as well as the claims of other copyright owners. Thus, in or about September and October 2008, at the request of the Lime Entities, Merlin met with the Lime Entities in both New York and London to discuss settlement and the possibility of a license agreement. After those meetings, the parties entered into a Tolling Agreement so that the parties could engage in further settlement discussions without prejudicing the rights of Merlin and its members. The Tolling Agreement was executed on or about October 27, 2008. A copy of the October 27, 2008 Tolling Agreement is annexed hereto as Exhibit B.

20. Nevertheless, from the outset of the negotiations, it became clear that although the Lime Entities had expressed an interest in settling with Merlin and its members, it did not wish to settle -- or even to discuss settlement terms -- just with Merlin. According to the Lime Entities, given that the Arista Action was already pending, that would be akin to putting the cart before the horse. The Lime Entities reiterated again and again that any settlement would have to be a global settlement involving the Major Labels (represented in the Arista Action), the independent record labels, and the music publishers, and would have to include a going forward license component. The Lime Entities stressed patience, and asked Merlin to wait and see if a deal could be struck with the Major Labels. If such a deal could be struck, then, the Lime Wire Entities assured Merlin, Merlin's independent record label members would receive the benefit of that deal, based on Merlin's members' aggregated market share vis a vis the Major Labels. With that assurance, Merlin continued to forbear from filing a lawsuit on behalf of its members, and extended the Tolling Agreement by a one page letter signed on or about July 8, 2009. A copy of the July 8, 2009 letter is annexed hereto as Exhibit C.

21. As time passed, Merlin became increasingly frustrated with the lack of communication between it and the Lime Entities regarding settlement. While the Lime Entities were paying lip service to the egalitarian notion of a "global settlement" where it would settle all copyright infringement claims, including those of Merlin's independent record label members, Merlin was never included in or invited to any of the settlement discussions between the Lime Entities and the Major Labels. For this reason, at Merlin's urging, the Lime Entities agreed to put in writing their promise to provide Merlin with the benefit of any deal struck between them and the Major Labels. An agreement was therefor entered into on or about November 13, 2009 (the "2009 Agreement"). The 2009 Agreement provided, inter alia, that "in the event [Lime

7

Wire] formally concludes a settlement and commercial agreement that includes a going forward license with any of the four major record labels . . . but in any event providing such agreements(s) embody both a settlement and/or release and going forward commercial terms . . . it will offer a settlement and commercial agreement(s) to Merlin on the terms specified in paragraphs 2 and 3 hereof (hereinafter referred to as the 'Offer')."

22. By the terms of the 2009 Agreement, the Offer was "expressly conditioned on: (i) Merlin guaranteeing the acceptance of and participation in all obligations of the settlement and/or commercial agreement reached with Merlin by Merlin members participating through Merlin representing at least seven and one-half percent (7.5%) of North American market share (such market share to be determined based on the annual total digital sales, as reported by Soundscan for the calendar year immediately preceding the date of the Offer, of all recordings on participating Merlin member labels (regardless of the label(s) or entity(ies) that have distributed such recording(s)) and (ii) neither Merlin nor any of the Merlin members participating in the settlement and commercial agreement hav[ing], as of the date of the Offer, initiated any administrative, judicial or other legal proceeding against any or all of Lime Group LLC, Lime Wire LLC and/or their respective officers or directors based on or arising from the [claims asserted in the Cease and Desist Letter] ((i) and (ii) collectively, the 'Offer Conditions')."

23. By the 2009 Agreement, the parties also extended the separate Tolling Agreement through February 27, 2010. A copy of the 2009 Agreement is annexed hereto as Exhibit D.

24. In or about July 2010, Merlin became concerned that there might not be an agreement between the Lime Entities and the Major Labels that included both a settlement and/or release and going forward commercial terms. Thus, Merlin insisted that the 2009 Agreement be revised such that Merlin and its label members participating would get the benefit (based on

8

market share) of any settlement made between the Lime Entities and the Major Labels even if such settlement was not coupled with a going forward license.

25. The Lime Entities agreed, and on or about August 11, 2010, the parties entered into a modification of the 2009 Agreement that was the quid pro quo for Merlin and its members not filing their own lawsuit at that time (the "2010 Agreement"). The 2010 Agreement was signed by Mark Gorton, as an authorized signatory of Lime Wire LLC, on behalf of itself, Lime Group LLC and Mark Gorton (i.e., all of the Lime Entities). A copy of the 2010 Agreement is annexed hereto as Exhibit E.

26. In the 2010 Agreement, the pertinent language of the 2009 Agreement was modified to state:

> LimeWire agrees that in the event it formally concludes a settlement **and/or** a commercial agreement that includes a going forward license (or any combination **or portion thereof**) with any one or more of the four major record labels (regardless of whether such settlement **and/or** commercial agreement is characterized or denominated as a 'settlement agreement,' a 'license agreement,' both, or neither, and regardless of whether such settlement and/or commercial agreement are in the same document or in separate documents, **and regardless of whether a commercial agreement and/or settlement agreement are executed at or about the same time**), it will offer a settlement and/or commercial agreement to Merlin on the same terms, subject to the conditions specified in paragraphs 2 and 3 hereof . . . . (Emphasis added.)

The phrase **"but in any event providing such agreements(s) embody both a settlement and/or release and going forward commercial terms"** was expressly stricken (from both of

9

**the sections of the Agreement where it appeared)** to further accomplish the intent of having the requirement that the Lime Entities offer to Merlin and its members a settlement on the same Material Terms as any settlement with the Major Labels be no longer contigent on the existence of a going-forward license component.

27. The same Offer Conditions contained in the 2009 Agreement were contained in the 2010 Agreement. Both of the Offer Conditions would have been satisfied by Merlin had the Offer been made (and will be satisfied by Merlin if the Lime Entities are ordered to make the Offer as required by the 2010 Agreement). Merlin can and will guarantee the acceptance of and participation in all obligations of the settlement by Merlin members participating through Merlin representing at least seven and one-half percent (7.5%) of North American market share (based on the metric set forth in the 2010 Agreement), and neither Merlin nor any of the Merlin members who will participate in the settlement will have, as of the date of the Offer, initiated any administrative, judicial or other legal proceeding against any or all of Lime Group LLC, Lime Wire LLC and/or their respective officers or directors based on or arising from the copyright infringement claims asserted in the Cease and Desist Letter.

28. Merlin would have accepted the Offer had it been made as required under the 2010 Agreement.

29. In or around May 2011, Merlin learned from various media reports that the Lime Entities had formally concluded a settlement with the Major Labels in which they agreed to pay $105 million to the labels. Despite having concluded such a settlement, the Lime Entities did not offer to Plaintiff Merlin a settlement on the same Material Terms (adjusted to account for relative market share) as the settlement with the Major Labels. In fact, the Lime Entities did not make an offer to Merlin at all.

30. Merlin, through its attorneys, contacted the Lime Entities, through their attorneys, and demanded that the Lime Entities comply with their obligations under the 2010 Agreement. The Lime Entities refused.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

31. Merlin repeats, realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 30 above.

32. As set forth in detail above, the Lime Entities have breached the 2010 Agreement (annexed hereto as Exhibit E) by failing to make a binding settlement offer to Merlin that includes a cash payment of no less than the amount of the cash payment made to the Major Labels in settlement of the Arista Action (less reasonable, documented, out-of-pocket legal fees actually paid by the Major Labels to outside counsel in connection with the Arista Action), subject to a market share adjustment to take into account the market shares of the settling Merlin members relative to the market shares of the settling Major Labels.

33. The Offer Conditions contained in the 2010 Agreement can or will be satisfied.

34. Merlin has been damaged by the aforementioned breach.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment)

35. Merlin repeats, realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 34 above.

36. Once the Lime Entities settled the Arista Action with the Major Labels, they were required by the 2010 Agreement to make a binding settlement offer to Merlin that includes a cash payment of no less than the amount of the cash payment made to the Major Labels in

settlement of the Arista Action (less reasonable, documented, out-of-pocket legal fees actually paid by the Major Labels to outside counsel in connection with the Arista Action), subject to a market share adjustment to take into account the market shares of the settling Merlin members relative to the market shares of the settling Major Labels.

37. The Offer Conditions contained in the 2010 Agreement can or will be satisfied.

38. After learning that the Lime Entities had concluded a settlement with the Major Labels, Merlin, through its attorneys, contacted the Lime Entities, through their attorneys, and demanded that the Lime Entities comply with their obligations under the 2010 Agreement and offer to Merlin a settlement on the same Material Terms (adjusted to account for relative market share) as the settlement with the Major Labels. The Lime Entities refused, claiming they had no obligation to do so.

35. Accordingly, inasmuch as the Lime Entities contend that none of them are required to make an Offer to Merlin as defined in and pursuant to the 2010 Agreement, and Merlin contends that such Offer is required by the 2010 Agreement, a dispute has arisen between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Merlin respectfully prays for judgment against Defendants as follows:

1. On the First Claim for Relief, damages in an amount to be determined at trial, but believed to be in excess of five million dollars ($5,000,000), plus interest.

2. In the alternative, on the Second Claim for Relief, a declaration that the Lime Entities are obligated to make an Offer to Merlin as defined in and pursuant to the 2010 Agreement;

3. Awarding Merlin its costs in this action, together with reasonable attorneys' fees and expenses.

3. Awarding Merlin such other and further relief as the Court may deem just and proper.

Dated: New York, New York
July 13, 2011

PRYOR CASHMAN LLP

By: *FScibilia*

Donald S. Zakarin
Frank P. Scibilia
7 Times Square
New York, New York 10036
(212) 421-4100

*Attorneys for Plaintiff Merlin BV*
